DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAMES S. COOK,**
Appellant,

v.

**JOHN COOK** and **ROBERT COOK,**
Appellees.

No. 4D17-1637

[September 20, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Rosemarie Scher, Judge; L.T. Case No. 50-2016-MH-003313-XXXX-NB.

Antony P. Ryan, Regional Counsel, and Richard G. Bartmon, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fourth District, West Palm Beach, for appellant.

Anya Van Veen, Jeffrey H. Skatoff, and Brian M. Spiro of Clark Skatoff, P.A., Palm Beach Gardens, for appellees.

GROSS, J.

The prospective ward in this case was found to be totally incapacitated and the lower court imposed a plenary guardianship upon him. We reverse because we find that the members of the examining committee reached their capacity and guardianship determinations without the benefit of a comprehensive examination of the prospective ward.

The prospective ward was James Cook, a 67-year-old man. Cook's brothers filed the petition to determine incapacity alleging that:

- Cook had been "living like a recluse/hermit, boarded up inside his condo, not letting anyone inside for several years;"

- A kitchen fire prompted the neighbors to call the authorities and Cook was subsequently "Baker Acted to Fair Oaks [and was] undergoing daily assessments by psychiatrists;"

- Cook had been mismanaging his life;

- Cook's personal health and hygiene were extremely bad;

- Cook had been in several car and motorcycle accidents;

- Cook's condominium was in foreclosure and he owed money "to many;" and

- Cook was unable to plan for his affairs or make practical decisions.

The petitioners attached a report prepared by the Palm Beach County Sheriff's Office that described the condition of Cook's condominium in cringing detail upon which it is unnecessary to elaborate here.

The petitioners requested "that an examination be made as to the mental and physical condition of the alleged incapacitated person as provided by law, and that an order be entered determining the mental and physical capacity of said person." The petitioners sought a plenary guardianship for Cook.

The guardianship court issued an order appointing a three-member examining committee pursuant to section 744.331(3)(a), Florida Statutes (2017). Each member was ordered to "make such examination of [Cook] as will enable them to ascertain thoroughly [his] mental and physical condition at the time of the examination."

The members of the examining committee timely submitted their reports, each recommending a plenary guardianship for Cook. The reports were placed into evidence without objection at the hearing, and the petitioners called each member of the committee to testify.

The committee's designated medical doctor was a primary care physician (the "doctor"). He interviewed Cook and also spoke with the social worker at Fair Oaks, another member of the examining committee, and Cook's brother. He reviewed the petition, the police report, Cook's medical chart from Fair Oaks, and a note from a physician at Medicana (the facility to which Cook was transferred after his discharge from Fair Oaks). The doctor testified that Cook was seen by a psychiatrist for two weeks at Fair Oaks and had a single psychiatric consultation at Medicana. The doctor concluded that Cook was "certainly disturbed" – that he had an unspecified psychosis, cognitive issues, lack of self-awareness, and his "reality testing" was poor. The doctor testified that Cook was not being

treated for his psychosis – his primary diagnosis. The medication he was on was directed at anxiety, depression and pain. The doctor testified that he did not perform either a physical or mental health examination of Cook.

The second member appointed to the examining committee was a layperson. Her examination of Cook consisted of interviewing him twice; speaking with his family members, two of his neighbors, a friend, and the social worker at Fair Oaks; reviewing his medical record from Fair Oaks; and receiving a list of his current medications and a note from his psychiatrist, which she admitted she could not read. The layperson testified that Cook was in denial about his major depressive disorder.

The third member of the examining committee was a licensed psychologist (the "psychologist"). His examination consisted of interviewing Cook twice; reviewing his medical records from Fair Oaks, the guardianship petition, the order of appointment, and a letter from one of the brothers; speaking to the other brother on the phone; consulting with Cook's primary care doctor; and giving Cook a Mini-Mental State Examination (MMSE-2) on two occasions. The psychologist testified that based on his examination, he concurred with the diagnosis Cook received upon his discharge from Fair Oaks – that Cook suffered from "major depressive disorder, unspecified anxiety disorder, and psychotic disorder not otherwise specified."

The psychologist admitted that he did not perform either a physical exam or a comprehensive mental health exam. In fact, he recommended that Cook be seen by an internist, and testified that neurological and neuropsychological exams were necessary to rule out a neurocognitive disorder. He admitted that the MMSE-2 he performed is "the briefest of screening instruments for neurocognitive impairment," and that Cook's results revealed that he had no cognitive impairment.

Cook's testimony demonstrated his lack of cognitive impairment. When asked why he was feeling "poorly" at the time the psychologist conducted his second interview, Cook explained:

> I think most people don't understand, and I didn't, how bad it is to be in a facility like this. I mean, I felt that, you know, the situations are that you have people screaming day and night. You can't get your sleep. You have people that are incontinent. And many other things that make having clarity of mind and so forth difficult.

> And at the same time, I was conscious of the situation I'm in of this process for guardianship can affect your entire life and all of your

rights, all of your property. And I was having very little say and very less knowledge of what was going on around me. And then the outcome depends on these quick little evaluations. I was very anxious because I felt isolated from the world, from knowledge of what was going on, and there was a lot of weight on the outcome. So I was anxious and concerned.

In response to follow-up questions, he detailed some of the behaviors exhibited by the other patients at Medicana. He also discussed the conduct of the night nurses insofar as they made it difficult for him to get quality sleep.

The prospective ward's testimony reveals that he was not only cognizant, but painfully aware and understandably anxious and afraid that the outcome of the guardianship proceeding would, as he explained, "take away all of my civil liberties and all of my legal rights . . . and take away all of my choices and freedoms."

"Proceedings to determine the competency of a person are generally controlled by statute and where a statute prescribes a certain method of proceeding to make that determination, the statute must be strictly followed." *In re Keene*, 343 So. 2d 916, 917 (Fla. 4th DCA 1977). The relevant statute is section 744.331, Florida Statutes (2017).

In 1989, the Legislature considered the state of guardianship law in Florida and the impact a guardianship had on the ward. The Legislature found:

> *Those persons currently adjudicated incompetent*
> *typically retain fewer rights than are retained by convicted felons,*
> *since most guardianship orders remove from the individual*
> *basic rights such as the rights to vote, own property, marry,*
> *consent to medical treatment, and contract . . .*

Preamble, Ch. 89-96, Laws of Fla.

The Legislature recognized that Florida's guardianship law contained "antiquated and imprecise statutory provisions," which resulted in thousands of prospective wards being denied due process of law. *Id.* As a result of these findings, the Legislature revised the law including setting forth "very specific procedures which shall be followed to determine incapacity." *In re Fey*, 624 So. 2d 770, 771 (Fla. 4th DCA 1993). The Legislature's findings support a strict construction of the guardianship statute.

- 4 -

Under the statute, the examining committee's role is to assess the abilities of the prospective ward and advise the court. The statute requires that *each member* of the examining committee examine the prospective ward. § 744.331(3)(e), Fla. Stat. The examination *must include a comprehensive examination. Id.* at § 744.331(3)(f). "The comprehensive examination report should be an essential element, but not necessarily the only element, used in making a capacity and guardianship decision." *Id.* If indicated, the comprehensive examination must include a physical and mental health examination. *Id.* If a mandatory aspect of the comprehensive examination is not indicated or cannot be accomplished, the committee member must expressly explain the reason for the omission. *Id.*

The precise language used by the Legislature reads:

> The examination of the alleged incapacitated person must include a comprehensive examination, a report of which shall be filed by each examining committee member as part of his or her written report. The comprehensive examination report should be an essential element, but not necessarily the only element, used in making a capacity and guardianship decision. The comprehensive examination must include, if indicated:
>
> 1. A physical examination;
> 2. A mental health examination; and
> 3. A functional assessment.
>
> If any of these three aspects of the examination is not indicated or cannot be accomplished for any reason, the written report must explain the reasons for its omission.

*Id.*

We find that the plain language of section 744.331 requires, at a minimum:

(1) An examination by each member of the committee;

(2) That the examination must include a comprehensive examination; and

(3) That the comprehensive examination must include, if indicated, a physical exam, a mental health exam, and a functional assessment.

The statute does not require three separate comprehensive examinations – rather, the statute requires *a* comprehensive examination.[1] The statute also does not specify *who* should perform the comprehensive examination. This leads us to conclude that the requisite three parts of the comprehensive examination could be performed by different specialists. We find that the statute is unambiguous, however, in its mandate that: a comprehensive examination be performed; a report of the comprehensive examination shall be filed; and the report should be an "essential element" in making the capacity decision.

Here, none of the members of the examining committee performed a physical examination of Cook; none filed a report of a physical exam of Cook; and none explained the reason for their omission of the requisite physical exam. Not only is the physical examination mandated by the guardianship statute, a physical exam could reveal a physiological reason for Cook's behaviors. Because a person's physical condition can have a profound impact on his mental health, a physical examination should be made in every case unless there is an express finding by the examiner that the exam was not indicated or could not be accomplished for any reason. The committee's failure to include the physical examination in this case means the members reached their capacity determinations and advised the court without considering all of the "essential elements."

We also find that the requisite mental health examination was not

---

[1] The dissent argues that one construction of the statute is that three separate comprehensive examinations must be performed. We agree with the dissent that such a construction would lead to an absurd result. While requiring three comprehensive examinations may be untenable, at least one is statutorily mandated. What happened in this case was not right – that the members of the examining committee, including a layman, rendered "expert" advice to the court on the capacity of the prospective ward without the benefit of *any* physical or mental health examination.

We think that the dissent is confusing the mandated "comprehensive examination" with the individual *members'* examinations. Each member must perform his or her own individual examination of the prospective ward. These examinations include meeting the prospective ward and perhaps talking to family and friends, interviewing caregivers and nurses, reviewing medical records, inspection of living conditions, et cetera. In addition, the member's examination must include a mental health exam, a physical exam, and a functional assessment. These three parts of the comprehensive examination do not need to be performed by the member, but the results must be included in the member's examination before the member can render an opinion. Thus a comprehensive examination report is a mandated *part* of each member's individual examination.

performed. A prospective ward deserves a thorough mental health examination to determine whether his condition is curable or treatable. We recognize that here, the psychologist administered the MMSE-2, reviewed records from the Fair Oaks psychiatrist, spoke with Cook's primary care physician, and interviewed Cook for nearly two hours. In a simpler case, this exam might be sufficient. This case, however, is not a simple case, and, significantly, the psychologist testified that Cook needs further evaluation. If a prospective ward *needs* further evaluation, fairness dictates that the evaluation occur before a court is asked to make a capacity determination.

We are not reversing the incapacity decision based on a reweighing of the evidence, as argued by the dissent. We are reversing for the failure of the members of the examining committee to base their reports on the type of information required by the statute. The members of the examining committee failed to complete all required parts of their examination. They were without authority to make their reports. *See Beckham v. Cline*, 10 So. 2d 419, 421 (Fla. 1942). It was error for the trial court to find Cook incapacitated in the absence of a comprehensive examination mandated by the statute and it was error for the court to rely on the members of the examining committee where they reached their conclusions without considering all of the statutorily-mandated factors. We express no opinion on Cook's capacity and remand so the proper procedures can be followed before any opinions as to Cook's capacity are rendered.

We note that appellees do not argue that the requisite physical and mental health examinations were performed in this case. Instead, they argue that Cook's remedy was to object to the reports of the examining committee and move to strike them. Because Cook allowed the reports into evidence without objection, the petitioners argue that he has waived any objection to the procedure followed by the examiners. *See generally Levine v. Levine*, 4 So. 3d 730, 731 (Fla. 5th DCA 2009). We disagree.

Each report contains an express declaration by the examiner that he or she "made a comprehensive examination" of the prospective ward. The testimony, on the other hand, revealed that none of the examiners made the requisite comprehensive examination. Because Cook could not have known what the members would say before the hearing, he did not waive his right to object to the examinations by failing to object to the reports themselves.

A petition to determine incapacity exposes the prospective ward to the possibility of losing his personal autonomy. Recognizing the vulnerability of alleged incapacitated persons, the Legislature placed safeguards in the

statute to ensure that precious human rights were not removed without due process. Among those safeguards is the requirement that a comprehensive examination be performed in every case. Only upon consideration of the results of the requisite examinations can the examiners make their determinations as to the capacity of an individual and advise the court.

The stakes could not be higher for the prospective ward. For this reason, those who participate in the process must strictly adhere to statutory mandates.

Here, the court found Cook incapacitated in the absence of the statutorily-required comprehensive examination. This was reversible error. On remand, the case should proceed from the appointment of a new examining committee. The order appointing the examining committee should track the language of the statute, mandating all parts of the comprehensive examination yet giving the committee members the flexibility to omit, with explanation, any part that is not indicated or could not be accomplished.[2]

Cook's status shall remain unchanged pending the outcome of the incapacity proceedings on remand.

*Reversed and remanded for further proceedings.*

KLINGENSMITH, J., concurs.
CONNER, J., dissents with opinion.

CONNER, J., dissenting.

I respectfully dissent from the majority opinion. Boiled down to its essence, the majority is reversing the trial court's judgment regarding Mr. Cook's capacity because none of the examining committee members performed "a physical examination" or "a mental health examination." Despite the fact that the legislature did not define those terms or the

---

[2] The dissent ponders at length the meaning of the words "if indicated," and concludes that "the statutory language 'if indicated' was meant for the judge to give guidance as to the extent of the capacity evaluation to be performed." We do not believe the trial judge, at the outset of a case and armed only with a one-sided petition, would be in any position to determine which parts of the comprehensive examination are "indicated." The statute mandates that all parts of the comprehensive examination be performed and that if any part is omitted, for any reason, the examining committee member must explain the omission.

parameters of those examinations, the majority appears to apply a technical definition of those concepts, as one would find in a medical dictionary, rather than using the plain definition gleaned from an ordinary dictionary. *See Goble v. Frohman*, 901 So. 2d 830, 833 (Fla. 2005) ("If a statutory term is not defined, its plain and ordinary meaning generally can be ascertained by reference to a dictionary.").

There are multiple problems with the analysis used by the majority. Section 744.331(3)(a), Florida Statutes (2017), governing the composition of examining committees provides that:

> One member must be a psychiatrist or other physician. The remaining members must be either a psychologist, gerontologist, another psychiatrist, or other physician, a registered nurse, nurse practitioner, licensed social worker, a person with an advanced degree in gerontology from an accredited institution of higher education, or other person who by knowledge, skill, experience, training, or education may, in the court's discretion, advise the court in the form of an expert opinion.

*Id.* The majority states that: (1) "[t]he statute requires that *each member* of the examining committee examine the prospective ward," and (2) "the examination *must include a comprehensive examination*," and quoting the statute that (3) "the comprehensive examination must include, if indicated, [a] a physical examination, [b] a mental health examination, and [c] a functional assessment," but then reaches the incompatible conclusion that "[t]he statute does not require three separate comprehensive examinations—rather, the statute requires *a* comprehensive examination." (emphases in original).

The properly constructed syllogism would be: *if* (1) "[t]he statute requires that each member of the examining committee examine the prospective ward," and (2) "the examination must include a comprehensive examination," and (3) "the comprehensive examination must include, if indicated, [a] a physical examination, [b] a mental health examination, and [c] a functional assessment," *then each examining committee member must perform "a physical examination," "a mental health examination," and "a functional assessment."* However, such a construction of the statute would be absurd. It would be unreasonable to believe the legislature intended for a social worker or "other person" to perform a physical examination or mental health examination as defined by a medical dictionary.

Additionally, in analyzing the requirements of section 744.331(3)(f), Florida Statutes (2017), the majority ignores other subsections of section 744.331(3). For example, section 744.331(3)(c) provides that:

> (c) Each person appointed to an examining committee must file an affidavit with the court stating that he or she has completed the required courses or will do so no later than 4 months after his or her initial appointment. *Each year, the chief judge of the circuit must prepare a list of persons qualified to be members of an examining committee.*

§ 744.331(3)(c), Fla. Stat. (2017) (emphasis added). Likewise, the majority ignores section 744.331(3)(d), which provides that:

> (d) *A member of an examining committee must complete a minimum of 4 hours of initial training.* The person must complete 2 hours of continuing education during each 2-year period after the initial training. *The initial training and continuing education program must be developed under the supervision of the Office of Public and Professional Guardians, in consultation with the Florida Conference of Circuit Court Judges; the Elder Law and the Real Property, Probate and Trust Law sections of The Florida Bar; and the Florida State Guardianship Association.*

§ 744.331(3)(d), Fla. Stat. (2017) (emphases added).

Based on subsections (3)(c) and (d), I presume the trial court appointed properly trained persons to act as the examining committee. Thus, I have difficulty concluding that all three examining committee members failed to act as properly trained. I suppose that one could conclude that all three members missed the mark if one assumes that the legislature intended "a physical examination" or "a mental health examination" as referring to concepts in a medical dictionary, rather than an ordinary dictionary.

I find section 744.331(3)(f) ambiguous. To expose the ambiguity, both subsections (3)(e) and (f) must be considered together:

> (e) Each member of the examining committee shall examine the person. Each examining committee member must determine the alleged incapacitated person's ability to exercise those rights specified in s. 744.3215. In addition to the examination, each examining committee member must have access to, and may consider, previous examinations of the person, including, but not limited to, habilitation plans,

school records, and psychological and psychosocial reports voluntarily offered for use by the alleged incapacitated person. Each member of the examining committee must file his or her report with the clerk of the court within 15 days after appointment.

(f) The examination of the alleged incapacitated person must include a comprehensive examination, a report of which shall be filed by each examining committee member as part of his or her written report. The comprehensive examination report should be an essential element, but not necessarily the only element, used in making a capacity and guardianship decision. The comprehensive examination must include, *if indicated*:

1. A physical examination;
2. A mental health examination; and
3. A functional assessment.
If any of these three aspects of the examination *is not indicated* or cannot be accomplished for any reason, the written report must explain the reasons for its omission.

§§ 744.331(3)(e) and (f), Fla. Stat. (2017) (emphases added).

It is unclear to me the majority's view of the meaning of "if indicated." To me, the obvious question is: "if indicated" *by whom*? Possibly the majority is of the view that "if indicated" refers to "*by the circumstances*," but that in turn leads to the question of "as determined *by whom*"—the trial judge or the individual examining committee member?

I contend the legislature meant by the "if indicated" language that the trial judge is to give guidance to the examining committee as to the extent of the examinations to be conducted pursuant to the statute. Such an interpretation makes sense, if one considers that a family member may petition for the appointment of a limited or plenary guardian, depending on the circumstances of the alleged incapacitated person. For example, a quadriplegic may need a limited guardian due to physical incapacities, but a mental health assessment or functional assessment may not be necessary, based on the petition filed. I doubt that in such a circumstance the legislature intended that the quadriplegic would have to undergo the demeaning experience of a mental health examination or a functional assessment. Additionally, such an interpretation of the "if indicated" language would allow the trial court to direct a medical doctor to perform a physical examination (within the meaning of a medical dictionary) and a

- 11 -

psychiatrist or psychologist to perform a mental health examination (within the meaning of a medical dictionary), and would more logically explain why all three examining committee members do not have to perform all three "aspects of the examination."

If I am correct that the statutory language "if indicated" was meant for the judge to give guidance as to the extent of the capacity evaluation to be performed, the order appointing the examining committee in this case must be considered. The order stated:

> Within a reasonable time after service of this Order, each [examining committee] member is required to secure the presence of JAMES S. COOK, the alleged incapacitated person, and to make such examination of her [sic] as will enable them to ascertain thoroughly her [sic] *mental and physical condition* at the time of the examination. If they consider her [sic] to be incapacitated, they shall determine whether she [sic] requires a Plenary or Limited Guardianship. They shall determine the alleged incapacitated person's ability to exercise those rights which the Petition to Determine Incapacity has requested to be removed.

(emphasis added). It does not appear from the language of the order that the trial judge "indicated" that a physical or mental health examination, as defined by a medical dictionary, was needed.

The trial judge considered extensive evidence in this case. Not only did the trial court receive testimony from all three examining committee members, but also testimony from Mr. Cook's siblings and Mr. Cook. The trial court also considered, without objection, the hearsay testimony regarding Mr. Cook's past medical and mental health history, as well as numerous pictures of his apartment. The trial court specifically found the testimony of Mr. Cook provided clear and convincing evidence of his incapacity. The evidence clearly showed that Mr. Cook was not taking his mental health medication, which led him to create a situation causing a fire in his apartment. When the first responders arrived, he had to be Baker Acted. At that time, he was malnourished, living in squalor, and did not understand what was going on. The majority is apparently impressed by Mr. Cook's seemingly coherent testimony at the hearing (arguably after receiving some benefit from the Baker Act), but the trial court's order makes it clear the *trial court* was not so impressed. The trial court's order makes it clear that trial court determined that Mr. Cook had no insight as to the circumstances leading to his being Baker Acted. In

my view, it would be reweighing the evidence from a cold record to reverse the trial court.

For the above reasons, I respectfully dissent.

*        *        *

**_Not final until disposition of timely filed motion for rehearing._**